IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                               **Case No. 11-40004-01-RDR**

DAVID G. OSBORNE,

        Defendant.

**MEMORANDUM AND ORDER**

Defendant is charged with violating the laws prohibiting the possession of controlled substances. This case arises from a traffic stop of a motor home on I-70 in Wabaunsee County, Kansas. Defendant has filed a motion to suppress the evidence obtained after a search of the motor home. Doc. No. 13. The court has conducted an evidentiary hearing upon the motion and, after full consideration, shall deny the motion to suppress.

I. FACTUAL BACKGROUND

The testimony and exhibits established that on December 12, 2010 at approximately 8:40 a.m. defendant was driving a large 1988 motor home eastbound on I-70 in Wabaunsee County, Kansas. It was a cold and windy morning. Defendant, a man in his seventies, was the sole occupant of the motor home.

Kansas Highway Patrol Trooper Andrew Dean was patrolling I-70 on that day. He is a 10-year veteran of the Kansas Highway Patrol and has had substantial experience and training in drug

interdiction.

Trooper Dean testified that he followed the motor home for about three miles. He observed the motor home encroach upon the fog line of the right-hand lane at least twice within a mile's distance. He further observed the vehicle cross the fog line a third time for a distance. So, he decided to make a traffic stop and determine whether the driver was fatigued or impaired. Trooper Dean acknowledged that wind was possibly an issue. The stop occurred on a dry, straight, somewhat hilly, rural stretch of highway where the wind does gust at times.

After defendant pulled over and stopped, Trooper Dean left his car and approached the right side of the motor home. He made contact with defendant at a right side door of the motor home which was located near the middle of the vehicle. There is no door on the driver's side of the motor home. Trooper Dean stated initially that he wanted to make sure everything was okay and asked if the wind was "kinda blowin'" the vehicle. Defendant agreed that the wind was blowing, but not as bad as on I-80. Defendant indicated that he "dropped down" from I-80 because of high winds which, Trooper Dean suggested in finishing defendant's sentence, were blowing the motor home all over the place.

Trooper Dean testified that he got close enough to defendant to see that defendant was not fatigued or intoxicated. There were no steps on the outside of the motor home. So, Trooper Dean

2

stepped within the body of the motor home to get a close look at defendant to check for intoxication. He never asked defendant about alcohol or whether defendant was sleepy. In response to questions, defendant said he was traveling to New Jersey to see friends and family. The motor home had a Nevada license plate and defendant had a Nevada driver's license. Trooper Dean returned to his car and ran defendant's driver's license information through the dispatcher. Trooper Dean's conversation with defendant lasted approximately 45 seconds before he walked back to his car.

Trooper Dean considered that Northern California and Oregon were source areas for hydroponic marijuana and that defendant's home, according to his license, was close to Northern California. Trooper Dean believed there was a valuable market on the East Coast for marijuana. He was also concerned that defendant was alone in the motor home, but there were two children's bicycles attached to the rear of the vehicle. This seemed unusual to Trooper Dean and he suspected that it might be a ruse to distract suspicion of drug smuggling. It took approximately three minutes and thirty seconds for Trooper Dean to run defendant's driver's license through the dispatcher and to write a warning ticket.

Trooper Dean returned to the right side of the motor home and gave defendant his driver's license and a warning ticket for failing to keep a single lane of travel. Trooper Dean testified that he left the motor home after handing defendant his documents.

3

He asked defendant about the bicycles on the back of the motor home. Defendant said the bicycles were for his nephews in New Jersey. Trooper Dean felt that defendant spoke haltingly when trying to explain the bicycles, like he was trying to piece together a story. This bit of conversation lasted 15 to 20 seconds.

Trooper Dean told defendant to have a safe trip. He and defendant commented about the cold weather. Then Trooper Dean again told defendant to have a safe trip. Defendant said "you too" and Trooper Dean stepped back, started to turn away and then asked defendant if he could ask a couple of questions before defendant left. Trooper Dean was outside the motor home at this point. Defendant agreed. Trooper Dean said that there have been problems with large amounts of drugs coming from the northern part of Nevada and California. He asked defendant if defendant was carrying "anything like that" in the vehicle. Defendant denied carrying drugs and immediately assented when Trooper Dean asked if he could take a "quick look." This interchange lasted approximately 15 seconds.

Trooper Dean said he would "just hop in there real quick" and said "we look for like large amounts." Defendant sat in the motor home while Trooper Dean started his search. He began by looking underneath a mattress on a bed. In his experience this was a popular drug storage area. But, the base of the bed had a piece of

plywood screwed down which covered any void which may have existed below the mattress. Trooper Dean thought the wood cover was suspicious. Trooper Dean looked in the refrigerator and noticed no food. He thought this was suspicious as well.

Trooper Dean then turned his attention to the bench seats around the kitchen table. A door leading to the space underneath one of the bench seats was open. The door was close to the floor of the motor home. Trooper Dean saw a towel and a suitcase in the space. He lifted up the seat cushion and the bench seat which was hinged at the back. He removed the suitcase, which was heavy. Trooper Dean asked defendant if the suitcase belonged to him. Defendant responded affirmatively. When Trooper Dean opened the suitcase he found several packages which appeared to contain a large amount of drugs. He asked defendant if the packages contained cocaine and defendant laughed nervously.

Trooper Dean then arrested defendant. Up to this point Trooper Dean had spent just under three minutes searching the motor home. Later, defendant told Trooper Dean that there were more drugs in the space covered by the plywood below the bed. A search of that area discovered a large amount of marijuana.

Defendant testified that there was a steady north wind with additional gusts. He drove the motor home at 60 miles per hour and stayed on the fog line in case the north wind was blocked by an overpass or a passing truck; this kept him from drifting into the

passing lane when the north wind was obstructed. Defendant testified that Trooper Dean was already in the motor home when Trooper Dean asked if he could ask some more questions. The video recording of the stop does not support this testimony because the legs of Trooper Dean are visible outside the motor home when he asks for permission to pose further questions. Trooper Dean later remarks that he will "hop in there real quick." This further indicates to the court that he was outside the motor home at that point in time.

Defendant stated that when Trooper Dean asked to take a "quick look" for large amounts of drugs, he did not think Trooper Dean was going to rummage through the motor home. However, he did not attempt to withdraw consent to the search or tell Trooper Dean that he had to stop his search.

Trooper Dean maintained a friendly tone as he spoke with defendant throughout the encounter. There was never a threat of force or exercise of force. He did not touch defendant. From the beginning of the traffic stop to the time of defendant's arrest was approximately eight minutes.

II. REASONABLE SUSPICION TO STOP

Defendant contends that the traffic stop violated his constitutional rights because it was not supported by reasonable suspicion. The government argues that Trooper Dean had a reasonable suspicion that defendant violated K.S.A. 8-1522(a) which

6

requires driving "as nearly as practicable entirely within a single lane."  The government also contends that Trooper Dean had a reasonable suspicion that defendant may have been too fatigued or intoxicated to drive safely.

"A traffic stop is permissible under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic violation has occurred or is occurring." U.S. v. Vazquez, 555 F.3d 923, 928 (10th Cir.) cert. denied, 130 S.Ct. 263 (2009) (interior quotation omitted).  The Kansas Supreme Court has stated that a violation of K.S.A. 8-1522(a) requires "more than an incidental and minimal lane breach" or "one instance of a momentary lane breach." State v. Marx, 215 P.3d 601, 612 (Kan. 2009).

The evidence in this case demonstrates more than an incidental or momentary breach of the fog line.  Trooper Dean observed three instances of driving on or over the fog line within three miles distance.  Defendant admitted that he was driving on the fog line, albeit as an intentional effort to keep the motor home from swerving into the left lane when the north wind was blocked.  Defendant was driving under windy conditions.  This was acknowledged by Trooper Dean's initial comments to defendant when he first approached the motor home.  It is also demonstrated by the video recording of the traffic stop.  But, the road was straight and dry and there was no problem with visibility. After reviewing all of the evidence the court believes, in spite of the wind

conditions and the size of the motor home, that Trooper Dean not only reasonably suspected that defendant was not driving entirely within a single lane as nearly as practicable, but that he had probable cause to make that conclusion. In sum, under the circumstances described to the court, we find that Trooper Dean had adequate grounds to find that defendant was violating K.S.A. 8-1522(a). See U.S. v. Rodriquez, 2000 WL 639581 *3-4 (10th Cir. 5/18/2000) (crossing fog line on I-70 twice in the short distance under windy conditions in Kansas satisfies probable cause standard); U.S. v. Sanchez-Perez, 2010 WL 2520651 (D.Kan. 6/23/2010) (touching fog line three times within one-half mile provides adequate grounds for traffic stop); U.S. v. Hernandez-Torres, 2006 WL 1232849 *2-3 (D.Kan. 4/27/2006)(driving on the fog line for approximately 200 to 300 feet provides reasonable suspicion to stop for a violation of K.S.A. 8-1522); U.S. v. Bassols, ___ F.Supp.2d ___, 2011 WL 1343158 (D.N.M. 2011) (making contact with fog line is sufficient to violate analogous New Mexico statute).

III.  SCOPE OF DETENTION

    A.  Loss of justification for traffic stop

Defendant contends that the scope and duration of defendant's detention exceeded the limits of the Constitution in this case. Defendant argues, citing U.S. v. Edgerton, 438 F.3d 1043, 1051 (10th Cir. 2006), that Trooper Dean should have concluded the traffic

stop as soon as he determined that defendant was neither fatigued nor intoxicated.  The court rejects this contention because the court believes that Trooper Dean had reasonable and adequate grounds for finding that defendant violated K.S.A. 8-1522 and for issuing a warning ticket.  This is in contrast to Edgerton, where the officer (who was also Trooper Dean) determined after making the traffic stop that there was no grounds to find a violation.  In this case, Trooper Dean was entitled to ask for defendant's driver's license and registration, check those documents, and write a warning ticket before defendant was free to leave.

B. Questions after returning defendant's documents

Defendant contends that Trooper Dean's admittedly brief questioning after he returned defendant's documents violated the Constitution.  These questions, which lasted about fifteen seconds, referred to the bicycles on the back of the motor home and defendant's nephews.  The court rejects this argument for the following reasons.

First, the court believes the questioning was consensual.  In other cases in which there was brief questioning after the return of documentation at a traffic stop, the Tenth Circuit has found the questioning to be consensual and not a violation of the Fourth Amendment.  See U.S. v. Chavira, 467 F.3d 1286, 1290-91 (10th Cir. 2006); U.S. v. Bradford, 423 F.3d 1149, 1158-59 (10th Cir. 2005); U.S. v. Castro-Holguin, 94 Fed.Appx. 788, 791-2 (10th Cir.

9

4/13/2004); U.S. v. Kerr, 35 Fed.Appx. 728, 732 (10th Cir. 4/18/2002); U.S. v. West, 219 F.3d 1171, 1176-77 (10th Cir. 2000). The case at bar shares many of the aspects of these cases. Trooper Dean was operating alone. He did not display his weapon or use a commanding tone of voice. He did not touch defendant or employ an intimidating approach. Indeed, he was friendly. As in the above-cited cases, Trooper Dean did not inform defendant that defendant could leave as soon as defendant received back his documentation. But, such advice is not required for there to be a consensual encounter. Chavira, 467 F.3d at 1291.

Second, even if the questioning was not consensual, defendant's detention was still reasonable. Defendant claims his "detention" violated the Fourth Amendment. Reasonableness is the touchstone of the Fourth Amendment. Michigan v. Fisher, 130 S.Ct. 546, 548 (2009). The Supreme Court has held that questioning which is unrelated to the grounds for detention does not violate the Fourth Amendment if the questioning did not extend the time of detention. Muehler v. Mena, 544 U.S. 93, 100-01 (2005). In the context of a traffic stop, the Supreme Court has held that questions unrelated to the grounds for the traffic stop do not convert the stop into something other than a lawful seizure as long as the questions "do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 129 S.Ct. 781, 788 (2009). The Tenth Circuit has stated that questioning which does

not appreciably lengthen the detention during a traffic stop requires no justification under the Fourth Amendment even if such questions are unrelated to travel plans and the ownership of the vehicle. U.S. v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir. 2006). In Alcaraz-Arellano, the questioning was done before the driver's license was returned. However, whether the detention is lengthened because of questions which occur before or after the license is returned would seem to have little relevance to the reasonableness of the seizure, particularly if probable cause supports the traffic stop. It is notable that the Tenth Circuit in Alcaraz-Arellano cites United States v. Childs, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc) for the proposition that "questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable." In Childs, the court held that in traffic stops supported by probable cause, the occupants of a vehicle have no "right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed . . . [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process remain reasonable." 277 F.3d at 953-54.

The court believes the traffic stop in this case was supported by probable cause that defendant violated K.S.A. 8-1522. The

11

length of detention was short and not unreasonable. The questions from Trooper Dean after he delivered defendant's driver's license and a warning ticket were pertinent to bicycles attached to the outside of the motor home. They were not pointed at matters likely to be sensitive or personal. They also did not extend defendant's detention by more than several seconds. Under these circumstances, the court does not believe Trooper Dean's questioning and detention of defendant was unreasonable or a violation of the Fourth Amendment. But see, U.S. v. Lyons, 510 F.3d 1225, 1237 16 (10th Cir. 2007) cert. denied, 552 U.S. 1329 (2008) ("once an officer returns the driver's license and vehicle registration and issues a warning ticket, he must allow the driver to proceed without further detention or questioning unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity").

Finally, the court rejects defendant's argument regarding the length of questioning during his detention because defendant has not proven that the evidence he seeks to suppress was found because of the alleged prolonged questioning. "To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did violate his Fourth Amendment rights. The defendant then bears the burden of demonstrating a factual nexus between the illegality and the challenged evidence." U.S. v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.) cert. denied,

531 U.S. 887 (2000) (interior citations and quotations omitted). Defendant must show that the evidence he seeks to suppress "would never have been found but for his, and only his, unlawful detention." U.S. v. DeLuca, 269 F.3d 1128, 1133 (10th Cir. 2001). Defendant has not met this burden. The court believes that Trooper Dean would have asked for permission to search the motor home whether or not he asked the questions of defendant regarding the bicycles. Trooper Dean was suspicious because defendant and the motor home were driving from an area he knew as a source for hydroponic marijuana to an area he knew as a market for the marijuana. Trooper Dean was also suspicious because the children's bikes were attached to a motor home whose sole occupant was a man in his seventies. Trooper Dean testified that he found defendant's answers to the questions involving the bikes to be halting and suspicious. But, there is no indication that but for defendant's answers to the questions, Trooper Dean would have skipped asking for permission to search the motor home. There is also no reason to believe that defendant would have denied permission to search if Trooper Dean had not asked the questions regarding the bicycles for defendant's nephews.

IV. SCOPE OF SEARCH

Defendant contends that Trooper Dean, by pulling out a suitcase from a storage area and opening the suitcase, exceeded the scope of defendant's consent. Defendant cites Florida v. Jimeno,

13

500 U.S. 248, 249 (1991) where the Court stated that "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open a particular container within the automobile."  Defendant asserts that when he consented to Trooper Dean's request to take a quick look for large amounts of drugs, he did not agree to a "search" of a closed suitcase stowed away in the motor home.  He analogizes a "look" to a "plain view" examination which the Court in Arizona v. Hicks, 480 U.S. 321 (1987) found could not be extended to moving stereo equipment for the purpose of looking at serial numbers.  Defendant also refers to U.S. v. Wald, 216 F.3d 1222 (10th Cir. 2000) where the court held that consent to take a "quick look" inside a car did not extend to a search of the car's trunk as well as luggage inside the trunk.

The government cites the general standard applied to this issue as recounted in U.S. v. Elliot, 107 F.3d 810, 814-15 (10th Cir. 1997):  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect."  The government contends that Trooper Dean received permission from defendant to take a "quick look" for "large amounts" of drugs and his search in fact was "quick" and covered areas which could or did contain "large amounts" of drugs.

Defendant does not appear to deny that Trooper Dean operated quickly. His objection pertains to the spaces or objects which Trooper Dean searched. We find that the cases cited by defendant either support the search in this case or are distinguishable from the facts of this case, and that ample case law supports the position of the government.

Jimeno, which like the case at bar involved the search of a closed container (a brown paper bag) in a vehicle, provides support for the search in this case. The Court stated:

> We think that it was objectively reasonable for the police to conclude that the general consent to search respondents' car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. "Contraband goods rarely are strewn across the trunk or floor of a car." . . . The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

500 U.S. at 251 (quoting U.S. v. Ross, 456 U.S. 798, 820 (1982)). The Court said that the consent to search very likely did not extend to breaking open a locked briefcase in the trunk of a car. Id. at 251-52. But, that is not the situation here. Trooper Dean searched inside the motor home and looked inside an unlocked suitcase. He did not search a locked vehicle trunk (until after defendant's arrest) or a locked suitcase.

Hicks is distinguishable from the case at bar because it does not involve a consent search. In Hicks, the police entered an apartment because a person in the apartment below had been shot by

15

a bullet passing through the floor of the apartment the police entered.  The police were engaged in a nonconsensual, warrantless search for "the shooter, victims, and weapons" which was justified by exigent circumstances.  480 U.S. at 325.  As they proceeded with the search, the officers' attention was caught by expensive stereo equipment which looked out of place in a squalid apartment.  The officers moved the equipment to find the serial numbers which were phoned into headquarters.  Then, arrests were made when the police were advised that the equipment was stolen in an armed robbery.  The Court held that the "search" conducted by the police fell outside the plain view doctrine since there was no probable cause to believe the stereo equipment was evidence of a crime or contraband until the police moved it and the exigent circumstances which justified the warrantless search had nothing to do with moving the stolen stereo equipment.  In sum, the issue in Hicks involved a construction of the plain view doctrine, not a decision upon what is objectively meant by a quick look for large amounts of drugs.

Wald is also distinguishable from the case at bar.  In Wald, a police officer requested and was given consent to take a quick look at the interior of an automobile.  The Tenth Circuit held that this consent to search did not extend to looking in the vehicle's trunk.  Here, Trooper Dean did not search the motor home's "trunk" and the court does not believe the interior storage area where

16

Trooper Dean found the suitcase with drugs can be analogized to a automobile's trunk. The motor home did have storage areas accessible from the outside of the motor home with the use of a key. These areas are more comparable to an automobile's trunk, and they were searched only <u>after</u> Trooper Dean found the cocaine and defendant was arrested in this case.

The following cases support the finding that Trooper Dean's search fell within the scope of the consent offered by defendant. <u>U.S. v. Lopez-Mendoza</u>, 601 F.3d 861, 867-69 (8th Cir. 2010) (permission to "look real quick" covered a 30-minute search of possible hidden compartments in a car when defendant stood by during the search and did not object); <u>U.S. v. Canipe</u>, 569 F.3d 597, 604-06 (6th Cir.) <u>cert. denied</u>, 130 S.Ct. 655 (2009) (permission to "look in" truck "would be understood by most people to involve a search" of the vehicle including an unlocked box); <u>Lyons</u>, 510 F.3d at 1240-41 (consent to "look in the back" of a Chevrolet Blazer extends to the entire rear portion of vehicle including the rear part of its undercarriage and spare tire attached thereto); <u>U.S. v. Gigley</u>, 213 F.3d 509, 515 (10th Cir. 2000) (request to "look" in van and "not take long" authorizes officer to do more than just peer into the windows); <u>U.S. v. Pena</u>, 143 F.3d 1363, 1368 (10th Cir.) <u>cert. denied</u>, 525 U.S. 903 (1998) (consent for officer to "look" in motel room authorized search of bathroom, including area above the bathroom ceiling); <u>U.S. v.</u>

McRae, 81 F.3d 1528, 1537-38 (10th Cir. 1996) (request to "look in" car gives authorization to search car and lift up carpeting in trunk of car); U.S. v. McSween, 53 F.3d 684, 688 (5th Cir.) cert. denied, 516 U.S. 874 (1995) (request to "look in" a vehicle effectively asks for permission to search entire vehicle, including under the hood, and the vehicle's contents); U.S. v. Pena, 920 F.2d 1509, 1514-1515 (10th Cir. 1990) cert. denied, 501 U.S. 1207 (1991) (court finds that consent to "look" in car authorized removal of rear quarter panel vent and comments that court "will not attach an unduly restrictive meaning to the officer's request to 'look' inside the vehicle"); U.S. v. Chaidez, 906 F.2d 377, 382-83 (8th Cir. 1990) (permission to "look" in vehicle authorizes search beneath vehicle's rear seat); U.S. v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986) (consent to request to "look through" automobile authorizes a thorough 14-minute search involving inter alia removal of back seat); see also, U.S. Marquez, 337 F.3d 1203, 1207-09 (10th Cir. 2003)(consent to search RV permits removal of plywood covering void below a bench seat).

The scope of defendant's consent to look in a vehicle for large amounts of drugs also authorized looking in bags which could contain large amounts of drugs. U.S. v. Ramstad, 308 F.3d 1139, 1146-47 (10th Cir. 2002) (where the expressed purpose is to take a "quick look around" a motor home for drugs, "that certainly implies that the officer could look wherever drugs might be hidden"); U.S.

v. Rich, 992 F.2d 502, 506-07 (5th Cir.) cert. denied, 510 U.S. 933 (1993) (consent to request to "have a look in" truck equates to a general consent to search of vehicle and its contents including luggage); U.S. v. Harris, 928 F.2d 1113, 1117-18 5 (11th Cir. 1991) (permission to "look in the car" permitted search of luggage in the trunk); see also Lopez-Medina, 601 F.3d at 867 (unqualified consent to search a vehicle for drugs includes consent to search containers which might bear drugs); U.S. v. Baker, 78 F.3d 1241, 1245 (7th Cir. 1996) cert. denied, 520 U.S. 1222 (1997) (consent to search covers looking in bag stowed under driver's seat); U.S. v. Zapata, 18 F.3d 971, 977-78 12 (1st Cir. 1994) (general consent to search vehicle includes consent to search duffel bags in the trunk).

There is a general proposition that a court may consider a suspect's failure to object contemporaneously when a search allegedly exceeds what is later claimed to be the limits of the suspect's consent. The failure to object is arguably an indication that the search was within the scope of the consent. E.g., Wald, 216 F.3d at 1228. In Wald, the Tenth Circuit held that this rule only applied when a suspect gave a general authorization to search. Id. The Circuit further held that there was no general authorization to search in Wald because the consent was only for a "quick look inside the vehicle." In Ramstad, 308 F.3d at 1147, the Tenth Circuit considered a suspect's failure to object during the duration of a search when there was an authorization to make "a

quick look around" a vehicle. In <u>Gigley</u>, 213 F.3d at 514-15, the Tenth Circuit also considered a suspect's failure to object when the suspect had previously been told that the officers would "look" and "not take long." The court is not certain whether the authorization to search in this case would be considered general or limited. Therefore, the court will not consider defendant's failure to object during the course of Trooper Dean's search of the motor home. Without considering this factor, after an objective examination the court believes the government has shown that Trooper Dean did not exceed the scope of the search agreed to by defendant.

V. CONCLUSION

For the above-stated reasons, the court shall deny defendant's motion to suppress.

**IT IS SO ORDERED.**

Dated this 2nd day of May, 2011 at Topeka, Kansas.

                                      s/Richard D. Rogers
                                      United States District Judge